Writs of certiorari to review judgments of the Court of Claims deciding that the respective plaintiffs were entitled to recover on the ground that the contracts in question were contracts on which the Government of the United States was liable.
The judgment of the Court of Claims was reversed January 3, 1939, (305 U. S. —) the Supreme Court stating:
Decision of these cases turns on the question whether certain contracts for the sale of timber on land of the Klamath Indian Reservation in Oregon, executed by the Superintendent of the Klamath Indian School by authority of an Act of Congress, are contracts of the United States upon which suits may be maintained in the Court of Claims.
Section 7 of the Act of Congress of June 25, 1910, 36 Stat. 855, 857, provides that the “timber on unallotted lands of any Indian reservation may be sold under regu *759 lations to be prescribed by the Secretary of the Interior, and the proceeds from such sales shall be used for the benefit of the Indians of the reservation in such manner as he may direct.” Section 8 of the Act provides that “The timber on any Indian allotment held under a trust or other patent containing restrictions on alienations, may be sold by the allottee with the consent of the Secretary of the Interior and the proceeds thereof shall be paid to the allottee or disposed of for his benefit under regulations to be prescribed by the Secretary of the Interior.”
The present suits were brought in the Court of Claims by respondents against the United States to recover alleged overpayments of amounts due upon' contracts for the purchase of timber upon certain unallotted and allotted Indian lands in the Klamath Reservation. The contracts were executed pursuant to Sections 7 and 8 of the Act of 1910 and regulations of the Secretary of the Interior. They provided that the prices fixed for the timber to be cut should be readjusted by the Commissioner of Indian Affairs at intervals of three years, but that permitted increases in price should “not exceed 50 per cent of the increase in the average mill run wholesale net value of lumber . . . during the three years preceding January 1 of the year in which the new prices are fixed.”
The Court of Claims in each case found that prices fixed by the Indian Commissioner had exceeded the permitted increases and that in consequence there had been an overpayment of the amounts due under the contracts. It held that they were contracts of the United States and in each case gave judgment against the government for the amount of the overpayments ... We granted cer-tiorari, the questions involved being of public importance in the administration by the United States of Indian lands and in defining the jurisdiction of the Court of Claims.
The Supreme Court stated that while the petitions for cer-tiorari raised the question whether, assuming the contracts were obligations of the United States, suits to recover the overpayments are upon quasi contracts or contracts “implied in law” not within the jurisdiction conferred on the-Court of Claims yet the quéstion before the Court was whether the contracts in suit are obligations of the United States, so as to give rise to claims founded upon them within the jurisdiction *760 of the Court of Claims. Determination of this question is decisive of the case; and other, questions were not considered.
The Supreme Court held that the contracts were not contracts of the United States.
Reviewing the contracts in the Algoma case as typical, the Supreme Court reviewed the proceedings had under the Act of 1910 and the regulations of the Secretary of the Interior thereunder, in pursuance of which the timber upon the designated lands within the Klamath Reservation was offered for sale; bids submitted by the Algoma Company were accepted, and contract of sale executed by the company and by the Superintendent of the Klamath Indian School, pursuant to departmental regulations, and approved by the Assistant Secretary of the Interior. Purchase payments by the Al-goma Company, including the alleged overpayments, were made to the Superintendent for the benefit of the Indians, and moneys received from the unallotted lands, less expenses, were deposited in the United States Treasury in an account designated “Indian Moneys, Proceeds of Labor.”
The Supreme Court said:
The Klamath Reservation was set apart as tribal lands under the Treaty with the Klamath Tribe of February 17,1870,16 Stat. 388, from lands immemorially possessed by them. Under the provisions of the treaty and established principles applicable to land reservations created for the benefit of the Indian tribes, the Indians are beneficial owners of the land and the timber standing upon it and of the proceeds of their sale, subject to the plenary power of control by the United States, to be exercised for the benefit and protection of the Indians. The United States acquired no beneficial ownership in the tribal lands or their proceeds, and however we may define the nature of the legal interest acquired by the government as the implement of its control, substantial ownership remained with the tribe as it existed before the treaty.
The action of Congress, in authorizing the sale of the timber, and the contracts prescribed under its authority by departmental regulations and approved by the Secretary, are to be viewed as the means chosen for the exercise of the power of the government to protect the rights and beneficial ownership of the Indians. The means are adapted to that end. Neither the United *761 States nor any officer purporting to act on its behalf is named a party to the contract. By its terms the contract is declared to be entered into “between the Superintendent of the Klamath Indian School, for and on behalf of the Klamath Indians, party of the first part” and the Lumber Company, “party of the second part.” It is thus on its face the contract of the Klamath Indians executed by the Superintendent, acting as their agent. The form of the contract and the procedure prescribed for its execution and approval conform to the long-established relationship between the government and the Indians, under which the government has plenary power to take appropriate measures to safeguard the disposal of property of which the Indians are the substantial owners. Exercise of that power does not necessarily involve the assumption of contractual obligations by the government. Their assumption is not to be presumed in the absence of any action taken by the government or on its behalf indicating such a purpose. See In re Sanborn, 148 U. S. 222, 227; Turner v. United States, 248 U. S. 354, 359. In this, as in any other case of a written contract, those who are parties to and bound by it are to be ascertained by an inspection of the document, and its provisions are controlling in the absence of some positive rule of law or provision of statute requiring them to be disregarded. * * *
As the Court of Claims found that the contracts for the sale of timber on allotted lands were entered into by individual allottees as prescribed by Section 8 of the Act of 1910, they stand on no different footing, as obligations of the United States, from the tribal contract or similar contracts entered into under the Act of 1889.
Since none of the contracts in suit were contracts or obligations of the United States, it is plain that receipt, by the Treasury of the United States, of payments made under them to the Superintendent for “the use and benefit” of the Indians, even though made under protest, gave rise to no contract for repayment implied in fact on the part of the United States, and that the cause of action, if any, is not within the jurisdiction of the Court of Claims.
Mr. Justice Stone
delivered the opinion of the Court.
Mr. Justice McReynolds and Mr. Justice Roberts took no part in the consideration of these cases.